UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOHN DOE, JANE DOE, and DAVID DOE,      )
                                        )
        Plaintiffs,                     )        CIVIL ACTION
                                        )        NO.
            v.                          )
                                        )
NEWTON PUBLIC SCHOOLS                   )
and the BUREAU OF SPECIAL EDUCATION     )
APPEALS of the MASSACHUSETTS            )
DIVISION OF ADMINISTRATIVE LAW          )
APPEALS,                                )
                                        )
        Defendants.                     )
_____ )

## **COMPLAINT**

1.   This is a complaint for judicial review of a final decision and order rendered by the

defendant Bureau of Special Education Appeals of the Massachusetts Division of Administrative

Law Appeals, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.

§§ 1400-1482, and M. G. L. c. 71B.  Plaintiffs are David Doe, a student who has attained the age

of majority, and his parents, John Doe and Jane Doe.  Plaintiffs seek reversal of a BSEA decision

and order, dated August 9, 2019, insofar as the decision and order denied the plaintiffs' requests

for relief from defendant Newton Public Schools regarding the 2017-2018 and 2018-2019 school

years.  Plaintiffs also seek a declaration that the parents acted reasonably in placing the student at

the Franklin Academy in East Haddam, Connecticut for the 2017-2018 and 2018-2019 school

years.  The plaintiffs further seek an order requiring the Newton Public Schools to reimburse the

parents for all expenses that they have incurred in connection with the student's Franklin

Academy placement.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiffs John Doe, Jane Doe, and David Doe reside in Newton, Massachusetts. John Doe ("Mr. Doe") and Jane Doe ("Ms. Doe") are the parents of David Doe ("David"). David has attained the age of majority and has delegated all decision-making in relation to special education programs and services to his parents, pursuant to 603 C.M.R. 28.07(5)(c). He currently attends college out of state, but his permanent residence is in Newton. Because of the confidential nature of special education proceedings, the plaintiffs have filed herewith a Motion for Leave to Proceed Anonymously and to Seal Record.

3.      Defendant Newton Public Schools is a governmental entity established by the City of Newton, Massachusetts, having a principal place of business at 100 Walnut Street, Newton, Massachusetts 02460. The Newton Public Schools ("Newton") is responsible for operating and managing the public schools within the City of Newton in compliance with state and federal law. Among other duties, Newton has specific responsibilities under IDEA and M. G. L. c. 71B to provide a free appropriate public education ("FAPE") to eligible students with disabilities who reside within the City of Newton.

4.      Defendant Bureau of Special Education Appeals ("BSEA") of the Massachusetts Division of Administrative Law Appeals is a governmental entity established by the Commonwealth of Massachusetts, having a principal place of business at 14 Summer Street, Malden, Massachusetts 02148. The BSEA is responsible for holding due process hearings to resolve special education disputes, pursuant to the requirements of 20 U.S.C. § 1415 and M. G. L. c. 71B.

5.      The Court has jurisdiction over the subject matter of this action pursuant to 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. §1331.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTS

7.      At all times relevant to this action, David was a child with a disability, within the meaning of 20 U.S.C. § 1401(3) and was a school age child with a disability, within the meaning of M. G. L. c. 71B, § 1.  At all times relevant to this action, therefore, he was eligible to receive special education and related services from Newton and Newton was required to provide him with a FAPE.

8.      Newton first found David eligible for special education when he was in kindergarten (2006-2007 school year).  He remained eligible until his graduation from high school on June 1, 2019.  Newton diagnosed David with autism in third grade (2009-2010 school year) and diagnosed him in addition with an emotional disability, including suicidal ideation, in sixth grade (2012-2013 school year).  In its triennial evaluations performed pursuant to the requirements of IDEA and M. G. L. C. 71B, Newton continued to find that David suffers from autism spectrum disorder and an emotional disability.  Newton's evaluations have also shown that David's intellectual profile is marked by disparities between his verbal comprehension abilities, which are very high, and his processing speed, which is quite low.

9.      David's most recent independent neuropsychological evaluation, by Jason McCormick, Psy.D. during eleventh grade (2017-2018 school year), confirmed that, although David is bright and academically motivated, he continued to suffer from Autism Spectrum Disorder, Level 1 (Asperger's Type); major depression; and an anxiety disorder.  Consistent with his autism spectrum disorder, David presented with social impairments (including a restricted range of affect and difficulty understanding others' perspectives); behavioral atypicalities (including a restricted range of interests); executive functioning challenges; and rigidity.  His

3

autism also caused him to lack self-awareness and metacognitive skills, making him unable to accept his disabilities and resistant to receiving services to address the effects of those disabilities or being identified as one who required such services.  Dr. McCormick, like Newton's evaluators, noted that David displayed an extreme discrepancy between his superior verbal reasoning ability (98th percentile on the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV")) and his dramatically lower processing speed (8th percentile).  Dr. McCormick also found that David's working memory was low (9th percentile) in relation to his verbal reasoning ability. Dr. McCormick explained that this is a highly unusual intellectual profile.  Due to his verbal comprehension abilities, David is capable of understanding concepts at a high level. However, his low working memory and slow processing speed act as a bottleneck, impeding his performance, causing frustration, and preventing him from accessing the curriculum.  The disparity in his abilities became particularly evident in higher-level courses (including, but not limited to, Honors level courses) which are complex and were too fast-paced for David's slow processing speed and limited working memory; however, regular education courses taught at a lower level and at slower pace were not appropriate for a student of his intellectual ability.  As Dr. McCormick explained, the combined effects of David's disabilities "significantly undermine [his] ability to navigate a traditional educational setting and . . . require the provision of intensive, specialized instruction and support throughout the day."  Report of Neuropsychological Evaluation, Jason McCormick, Psy.D., October 17, 2017, February 13, 15, and 20 and March 1, 2018 ("McCormick Rep."), p. 15.

10.    David's special education services in elementary school included inclusion support from an aide throughout the day, social pragmatics instruction, occupational therapy, and adaptive physical education.  In middle school, he continued to receive special education

supports and services throughout the day, including direct services of an aide in each of his academic classes and 50 minutes per day of academic support services. David also received services to address his emotional needs, such as meetings with the school psychologist (later replaced by the school psychologist's consultation to his teachers). In addition, David received academic modifications for Content ("Content/activities should be modified for volume and complexity when necessary," "Make abstract concepts concrete and relate them to the big picture," "Present material in a visually appealing manner.") and for Methodology/Delivery of Instruction ("small group learning when appropriate, direct instruction/modeling, multi-sensory instruction").

11. When David made the transition to Newton North High School ("NNHS") for ninth grade (2015-2016 school year), Newton reduced his services significantly. Newton eliminated the direct services of an aide in each of his core academic classes; eliminated the direct service of academic support, which he had previously received for 50 minutes daily; eliminated the school psychologist's services; and eliminated all academic modifications. The ninth-grade IEP provided no emotional goals, objectives, or services. The only direct service that remained was one 55-minute weekly group session of social pragmatics instruction with a speech pathologist.

12. After Newton eliminated the services and modifications, David struggled socially and emotionally in ninth grade. Although David's grades for most of his courses in ninth grade were fairly good, he suffered some academic struggles. He was the target of bullying and harassment. He had no friends. He began to focus obsessively on academic success. Ninth grade became the start of a downward spiral for David, which only intensified in tenth grade.

13.     Midway through ninth grade, in early 2016, Newton performed a triennial re-evaluation of David.  Newton's re-evaluation reports and teacher assessment forms contained many red flags evidencing David's academic, social, and emotional difficulties.  Nevertheless, when David's special education Team convened in March 2016 to discuss the re-evaluation results and develop his Individualized Education Program ("IEP") for the remainder of ninth grade and for tenth grade, Newton failed to propose any additional services or modifications to meet his social, emotional, or academic needs.  Again, he was provided with no academic support, no academic modifications, and no goals, objectives, or services to address his emotional issues.  The only direct service provided in his next IEP (covering 3/28/16-3/29/17) consisted of a reduced amount of social pragmatics instruction (15 minutes per week, 1:1; the IEP also provided 30 minutes per month of consultation to David's teachers by the speech pathologist).  Despite misgivings, David's parents relied on the judgment of the Newton staff.  They accepted the IEP and it remained the IEP implemented throughout tenth grade.

14.     In tenth grade (2016-2017 school year), when he was receiving only minimal special education services (none to address his emotional issues) and facing greater academic, social, and emotional challenges, David's situation worsened.  Teachers reported serious concerns about his academic performance and about his emotional presentation.  His autism caused him to perseverate on the concept of academic success.  He became obsessed with a particular chain of perseverative beliefs: first, that happiness and success in life were determined by the quality of one's job; second, that the quality of one's job was determined by graduating from a "good college"; and third, that getting into a "good college" was determined by a high school transcript and resume that reflected participation in many Honors level classes and participation and leadership in extracurricular activities.  He therefore devoted himself to single-

minded pursuit of success in Honors classes (of which he was taking two) and, to a lesser extent, to several extracurricular activities such as the Model UN.  When he came home from school, he would go immediately to his room and spend all his time studying.  He stayed up very late doing coursework, often getting only a few hours of sleep.  Teachers commented that he appeared "tired and sick," "frustrated," and "shut down" in class.  He did not socialize.  He continued to have no friends, and continued to be ridiculed and harassed by other students.  His mental health deteriorated.  Despite the assistance of tutors, whom his parents had engaged to help provide the specialized instruction and support that Newton failed to offer, David struggled to complete assignments and achieve passing grades.  By the time of his annual review Team meeting on March 8, 2017, he had F's in English and Honors chemistry, a D- in Honors math, D's and F's in Latin, and a C in history.  Because of his difficulties, David's teachers did not recommend him for Honors classes for junior year, meaning that David's eleventh grade math and science class levels would be downgraded in comparison to tenth grade.  At the March 8, 2017 meeting, when informed that he would not be recommended for Honors math or biology for his junior year, David broke down sobbing.  He became so distraught that the meeting had to be concluded.

15.    Despite David's obvious academic and emotional distress, Newton proposed no changes to his services in his next IEP (covering 3/8/17-3/7/18).  He continued to receive no academic modifications; no academic support services or specially designed instruction; and no goals, objectives, or services to address his emotional needs.  The IEP continued to propose only 15 minutes of social pragmatics instruction per week and 30 minutes of consultation per month – exactly the same program that had been failing David over the preceding twelve months.  His parents did not accept this proposed IEP.

16.     David's distress at being downgraded from Honors level classes so preoccupied and overwhelmed him that it triggered thoughts of suicide.  On March 21, 2017, David became so miserable and depressed that he developed a plan to kill himself by jumping out of a fourth-floor window at NNHS.  After he disclosed the plan to his mother, his parents immediately informed Newton.  His guidance counselor suggested that the parents take him to Riverside Community Care for a crisis evaluation and engage a private therapist, both of which they did.[1] Newton failed to take any steps of its own to address David's deterioration and emotional crisis, however.  Newton failed to propose a suicide safety assessment (something that the parents only later learned should have been available).  Newton failed to refer David to the school psychologist, or even inform the school psychologist that he had threatened suicide with a plan. Newton failed to propose any re-evaluation that could have provided updated information on David's condition.  Newton failed to reconvene the Team and failed to propose any changes to David's goals, objectives, accommodations, services, or placement as a result of his worsening emotional state and his suicidal thoughts.

17.     David returned to school but, as his academic dean described, he remained "rigid" and "agitated," obsessing over his inability to take Honors courses during his junior year and the perceived consequences of that failure for his self-image and for his future.  He made little progress in his private therapy with Albert Cotugno, Ph.D.  As Dr. Cotugno described, David remained "rigidly and obsessively focused" on social issues, academic expectations, and concerns about his self-worth.

---

[1]  The parents had previously provided David with private therapy from Donna Podorefsky, Ph.D., for about a year and a half during middle school.  Unfortunately, David had been resistant to therapy, and it was terminated on Dr. Podorefsky's advice.  On March 29, 2019, David began private therapy with Albert Cotugno, Ph.D.

18.     David's social struggles increased as the school year went on.  In May 2017, he ran

for a position as an officer of the Model UN.  When (contrary to his expectation) he was not

elected, he perseverated about the election results.  His perseveration and agitation led him to

send out a mass e-mail asserting that the election was "rigged."  This had serious social

repercussions that a typical student could have foreseen but that David, due to his autism, did

not.  He became even more of a social pariah at school than he had previously been.  In June,

another incident occurred, when David discovered and reported a plan by other students to cheat

on their chemistry final.  David chose not only to report the cheating to the teacher but also to

text his reporting to all members of the Honors chemistry chatroom.  The other students abused

David verbally and threatened him with physical harm.  As a result, David withdrew even more

from interaction with others.

19.     On June 21, 2017, the Team reconvened at the request of David's parents.

Newton ultimately proposed a change to his March 2017 proposed IEP (which had not been

accepted by his parents), but it came with strings attached.  The parents and Newton agreed that

David required academic support services, which he was resisting due to his abhorrence at being

identified as a special education student.  Newton refused to provide such services unless David

were also placed in eleventh-grade Honors biology, as an incentive to accept the academic

support class.  (This was despite the fact that Newton staff, among themselves, doubted that an

academic support class could perform the "miracle" of allowing David to access his general

education classes.)  The parents, who had concluded that David's placement in tenth-grade

Honors classes was academically unsuccessful and was harming his mental and physical health,

disagreed with an Honors biology placement.  They believed that an Honors biology placement

would deprive David of access to the academic curriculum and would cause his emotional

distress to increase, possibly driving him to contemplate suicide again. They believed that Newton was taking the path of least resistance, acceding to David's demand for Honors instruction in order to avoid the difficulty of dealing with his resistance, which was itself caused by his disability-related perseveration on the subject of Honors classes and by his lack of self-awareness as to his challenges and lack of acceptance of his limitations.

20.     Following the meeting, the parents received a revised IEP (dated 6/23/17, covering 3/8/17-3/7/18) that proposed to add academic support services (four 60-minute classes per week, plus 15 minutes per month of consultation by a special education teacher). The IEP still contained no goals, objectives, or services to address David's worsening emotional needs. It contained no modifications to assist David in any academic classes. The IEP failed to mention David's suicidal ideation, his referral to Riverside for crisis evaluation, the debacle that followed the Model UN election, or the threats and abuse he suffered after exposing the chemistry cheating scandal.

21.     In July 2017, David's parents found a large bottle of Tylenol in his room. When they questioned him about it, he admitted that he was contemplating using it to commit suicide. His parents took him to pediatric psychiatrist Michelle Palumbo, M.D., of the Lurie Center for Autism of Massachusetts General Hospital. Dr. Palumbo assessed David on July 14, 2017. David told Dr. Palumbo that he was depressed, had no friends, and wished he were dead "all the time." Dr. Palumbo stated that he presented with symptoms of a severe major depressive disorder, with active suicidal ideation and a history of suicidal ideation with a plan. She told his parents to take him immediately to the emergency room to be evaluated for inpatient admission, which they did.

22.     On the same day (July 14, 2017), David was admitted as a psychiatric inpatient at the North Shore Medical Center ("NSMC").  He stayed there for twelve days, after which he was transferred to the McLean Hospital Southeast Adolescent Residential Program ("McLean"), also as an inpatient.

23.     David's parents notified Newton about his hospitalization by e-mail on July 19, 2017, only five days after his admission to NSMC.  They informed his academic dean and guidance counselor that he had reported additional incidents of bullying at NNHS, that he was "adamantly opposed to enrolling at NNHS this fall," and that "we foresee as quite unlikely [David's] enrolling at NNHS for his junior year."  E-mail from John Doe to Scott Heslin and Christine Potter, July 19, 2017.  The only reply that they received came more than two weeks later, on August 3, 2017, from the academic dean, who offered to meet with David to discuss the bullying. The parents explained that a meeting was not possible right then as David was still hospitalized and discussing the bullying would not aid in his recovery.  The parents heard nothing further from Newton for more than three weeks (and then only in response to the parents' request for a Team meeting), despite the fact that, as the parents later learned, their message had been forwarded to and received by the top reaches of the NNHS administration (the NNHS principal and the head of special education at NNHS).

24.     During the last week of his hospitalization at NSMC, David told his mother that he intended to kill himself if he were forced to return to NNHS.

25.     On July 26, 2017, David was transferred to McLean.  After updating his parents about the emotional stress caused by David's continued rigid perseveration on academic success, David's caseworker at McLean, Catherine Lopes, LCSW, counseled the parents that the most effective way to support David's recovery, and in particular to help him to look forward instead

of perseverating in a self-destructive manner on what he perceived as his past failures, would be for him not to return to NNHS, and for the parents instead to locate a therapeutic school program that could address his academic, social, and emotional needs.  She recommended that David be involved in the search.

26.     David remained at McLean for fourteen days, until August 9, 2017.  On his discharge, McLean staff reported that "[l]ittle progress was made as [David] displayed *serious emotional difficulties and thought rigidity.*  [David's] thought rigidity is especially concerning around school performance and rigor and suicide."  Letter from Peter Adams, M.D., and Catherine Lopes, LCSW, to Whom It May Concern, August 9, 2017 (emphasis in original).  The McLean staff stated that David would "require extensive therapeutic support in order to be able to access the academic curriculum at any level."  *Id.*  Given his "ongoing emotional difficulties, coupled with suicidal thinking, which will continue to require intensive interventions," they strongly recommended that David be placed in a therapeutic school that had "experience in working with teens with high-functioning Autism spectrum disorder and ongoing mood crises." *Id.*

27.     David's parents were very concerned about David's mental health, which continued to be precarious after his discharge from McLean.  They feared that he would succeed in carrying out a plan to kill himself.  Based on the advice of the professionals who had worked with David, including Dr. Palumbo, Dr. Cotugno, Ms. Lopes and Dr. Adams, and based on the seriousness of David's recent threat of suicide, his parents determined that the June 2017 proposed IEP would not provide David with a FAPE.  On August 18, 2017, David's parents delivered written notice to the Newton Assistant Superintendent for Student Services that they

were rejecting the June 2017 proposed IEP and the proposed full inclusion placement[2] at NNHS. They wrote that they believed David required a specialized therapeutic placement.  They requested a Team meeting.

28.     After leaving McLean, David met twice with Dr. Cotugno and once with Dr. Palumbo during August 2017.  Both stated in writing that David required placement in a highly specialized therapeutic program.  Dr. Palumbo explained that David required "a comprehensive, highly therapeutic milieu that will offer him specialized, systematic and consistent services in the social-emotional arena as well as in the areas of academic learning and independent living." Letter from Michelle Palumbo, M.D., to Whom It May Concern, September 8, 2017.  Dr. Palumbo warned that David's state of being and locus of control were "quite fragile," placing him "at strong risk."  *Id.*  She stated that a public-school setting lacked the "degree of cohesiveness required" to address his "ongoing and often changeable manifestation" of both his autism spectrum disorder and his major depressive disorder.  *Id.*

29.     With the start of the school year fast approaching, David's parents began investigating potential alternate placements.  Although they visited both day and residential programs, they concluded that David required a residential program in order to address his academic, social, and emotional deficits in a thorough and effective manner.  They believed that the only way for him to avoid replicating his previous pattern, which sacrificed sleep, friendship development, and almost everything else to study time, was to be placed in an environment

---

[2] An educational placement is considered to be "full inclusion" if the student is pulled out of the regular education environment for special education services for no more than 20% of his or her time. Placements involving 21%-60% pullout are considered to be "partial inclusion."  A public-school placement in which a student is pulled out for more than 60% of the time is considered "substantially separate."  The next placement model after "substantially separate," in in order of "restrictiveness," would be a private or public special education day school, followed by a residential program.  *See* Massachusetts Department of Elementary and Secondary Education, Placement Consent Form – PL-1: 6-21 year olds, available at http://www.doe.mass.edu/sped/iep/forms/english/pl1-6-21.pdf.

where professionals would monitor his emotional well-being, limit his study time, and ensure that he learned social pragmatic skills and spent time practicing those skills with peers.

30.     Among the schools the parents investigated was Franklin Academy, which was recommended by another school.  The parents concluded that Franklin would meet David's needs because it is a college-preparatory school designed to serve bright students who, like David, have autism spectrum disorders and similar disabilities.  The profile of the typical Franklin Academy student is similar to David's, involving strengths in verbal comprehension and challenges with executive functioning, nonverbal communication, frustration tolerance, transitions, metacognition, social perception, and processing speed.  Many of the students at Franklin also have emotional issues similar to David's.  The parents applied to Franklin Academy on August 26, 2017 and David was offered admission to Franklin on August 30, 2017.  The actual enrollment was secured on September 3, 2017, with the payment of tuition.

31.     Meanwhile, the parents' rejection of David's NNHS placement captured Newton's attention in a way that their communication of his suicidal ideation and hospitalization had not.  Newton wrote to the parents on August 25, 2017, proposing a Team meeting on August 31, 2017.  The parents accepted that date and sent Newton a copy of the August 9, 2017 letter from Dr. Adams and Ms. Lopes at McLean, recommending a therapeutic school placement.  (This was the only written recommendation that the parents had received by the time of the Team meeting.  Letters from Dr. Palumbo and Dr. Cotugno were not yet available.)

32.     The Team convened on August 31, 2017.  The parents attended with an educational consultant whom they had recently retained, Teresa Sauro.  During the meeting, David's mother shared that David had threatened to kill himself if he were required to return to NNHS.  The Newton members of the Team did not react to this statement, but instead

14

immediately proposed that David remain in a full inclusion placement at NNHS.  The only proposed changes in services were the addition of two 30-minute sessions per week of counseling with the school adjustment counselor "as needed" and an increase in social pragmatic instruction back to 50 minutes per week.  Newton continued not to propose any emotional goal or objectives.  At no time did Newton explain how it would keep David safe from self-harm at school, when he would be out of sight of the special education staff for six out of seven hours in the day.  Newton also failed to explain why it believed that up to one hour of counseling per week could effectively address David's emotional needs, when months of weekly therapy outside of school, followed by therapy as an inpatient, had proved unsuccessful.

33.     Newton proposed that David become affiliated with its "LINKs" program, which Newton stated was designed for "all kinds of students" who might be experiencing various types of challenges.  No staff member, consultant, or other service provider from the LINKs program attended the Team meeting or was even invited to attend.  Ms. Sauro, on behalf of the parents, asked many questions about LINKs, most of which the staff at the meeting were unable to answer.  From information available on Newton's website, it appeared that LINKs was focused on addressing the needs of students who were low academic achievers and/or had low academic motivation, who suffered from school attendance problems, and/or who required a strict system of behavioral consequences to ensure their classroom attendance and work completion – all of which made them the very opposite of David.  Newton staff admitted that the LINKs academic classes were too low-level to be appropriate for David.  He would remain in the regular education setting, without any in-class supports or modifications, for all academic courses.  The Newton staff also stated that David would not attend a LINKs homeroom.  His affiliation with LINKs would consist of receiving LINKs academic support four class periods per week,

receiving two 30-minute sessions per week of counseling "as needed," and being able to "drop

in" to the LINKs room any time he felt the need for emotional support (which David, with his

metacognition issues and extreme desire not to be identified as needing special education, would

never do).  In reality, David's proposed program for eleventh grade differed very little from the

one that had failed him in tenth grade.  The Newton members of the Team offered no explanation

as to how or why the eleventh-grade full inclusion program could meet his needs, when the

tenth-grade program had clearly failed to do so.

34.     Near the end of the meeting, Ms. Sauro informed Newton of the parents' intent to

place David as a residential student at Franklin beginning on September 3, 2017 and requested

that Newton reimburse the parents for the placement.  IDEA explicitly permits this type of

unilateral placement.  20 U.S.C. § 1412(a)(10)(C)(ii).  The notice given at the Team meeting

complied with IDEA's requirements.  *See id.* § 1412(a)(10)(C)(iii)(I)(aa).  The Newton members

of the Team ended the meeting without responding to the request.

35.     The parents received an amended IEP on or about September 15, 2017 (IEP dated

September 8, 2017, covering 3/8/17-3/7/18).  The IEP provided no further information about the

role that LINKs might play in the program proposed for David.  This IEP failed even to mention

his hospitalization of nearly a month for emotional issues.  Like the June IEP, it also failed to

mention David's suicidal ideation, his referral to Riverside, and the fallout that he experienced

from his reactions to the Model UN election and the chemistry cheating scandal.

36.     On October 17, 2017, the parents rejected the IEP and refused the proposed full

inclusion placement at NNHS.  They provided Newton with Dr. Cotugno's treatment summary,

Dr. Palumbo's letter, and other documentation supporting David's need for a specialized

placement (all documents that they received after the date of the August 31, 2017 meeting).

Newton failed to reconvene the Team to consider this information.  Newton did request and then failed to follow up on consent forms allowing Newton to speak with the medical professionals and with Franklin Academy.

37.     David's transition to Franklin Academy was difficult and slow, due to his resistance and desire to be "normal."  Franklin's program focuses on four core competencies: executive functioning, emotional regulation, social skills, and self-care.  The program at Franklin includes therapeutic supports and offers small classes (approximately 7 students); social skills training; psychiatric consultation; specialized instructional techniques and modifications; fewer transitions throughout the day; and a focus on educational and life skills development.  Franklin employs a team-based approach to educating students.  Team members teach classes, provide counsel and advice in daily life around the clock, sponsor co-curricular activities, and supervise at night in the dormitory to ensure that students have consistent access to a small group of the same adults who know and understand them.  The team meets three times per week to discuss individual student needs and ensure that those needs are being addressed consistently across environments.  The 24/7 framework and "round the clock" mentality allow the staff to address specific incidents as they occur.  Improving social skills and fostering social interactions are top priorities.  What is taught in the classroom about human interactions is practiced and reinforced in many different venues across campus throughout the day and evening and during weekends.  In addition, mandatory classes for new Franklin students such as "Franklin 101," which David took, focus on metacognition, so that students learn what it means to be on the autism spectrum and gain a better understanding of their strengths and weaknesses.

38.     In addition to the Franklin program, David's parents arranged for him to receive weekly therapy from Barbara Hughes, Ed.D., LPC, on campus throughout his time at Franklin.

17

Dr. Hughes was highly familiar with the Franklin program and coordinated David's therapy (which included cognitive behavioral therapy, mindfulness, and social thinking) with that program. She also shared information with the members of David's team at Franklin, keeping them updated as to developments and techniques in her therapy with him.

39.     Although by December 2017 David was beginning to make progress, starting to trust the Franklin staff, to participate in social interactions, and to make friends, both Dr. Hughes and Franklin's academic dean (educational coordinator) Shannon Cove, M.Ed. believed that David was not ready to move on from Franklin at the end of the 2018-2019 school year. David engaged in activities at home in the summer of 2018, but only in the presence of other family members or with a few friends from Franklin; he did not venture into the community alone, even just to ride his bicycle.

40.     In late 2017 and early 2018, David's parents arranged for him to receive an independent neuropsychological evaluation with Jason McCormick, Psy.D. Dr. McCormick has more than twenty years' experience as a neuropsychologist and has particular expertise in evaluating children and adolescents with Autism Spectrum Disorder – Level 1 (formerly known as Asperger's Syndrome). As discussed above, Dr. McCormick confirmed David's diagnoses of Autism Spectrum Disorder, Level 1 (Asperger's Type), major depression, and anxiety disorder, and explained the educational ramifications of David's disabilities. Dr. McCormick stated that David required "a specialized educational program that focuses on working with students with mild autism spectrum disorders," who present with social, emotional, and executive functioning challenges. McCormick Rep., p. 19. Dr. McCormick recommended, *inter alia*, that David be placed in a program with small classes (no more than eight students); peers with profiles similar to David's; teachers trained and experienced in working with such students; consistent use of

language-based teaching techniques; social, emotional, and executive functioning instruction and supports woven into and reinforced throughout the day; and the ability to provide intensive work on development of metacognitive skills.  *Id.*  Dr. McCormick further stated that, due to the degree of his social impairment and isolation, David required a residential program in order to address his social challenges and develop his skills not only during the classroom day and during structured activities but also during unstructured social activities after school hours.  Dr. McCormick warned that returning David to NNHS, or indeed to any traditional public high school, created a serious risk of self-harm in light of David's "serious suicidal contemplation in the past" and his more recent statement that he would kill himself if forced to attend NNHS.  *Id.* at 21.

41.     Dr. McCormick found that David's skills were not consolidated when he tested David in 2018.  He was concerned that the social and emotional gains David was making would unravel if David were required to move to a different setting, where he would have to make new friends and he would not have the support found in a specialized residential placement such as Franklin.

42.     On April 25, 2018, the Team reconvened in Newton for an annual review and to consider Dr. McCormick's report.  Dr. McCormick attended the meeting.  Although Newton had no new evaluative data of its own and although Newton's psychologist agreed that the report accurately reflected David, the district disagreed with Dr. McCormick's recommendation of a residential placement.  Based on Dr. McCormick's report, however, Newton agreed that its former proposal of a full inclusion program was inappropriate and proposed instead that David transfer to an unspecified out-of-district private or public day program.  The parents were not provided with any information about the specific services that David would receive in such a

program, what the peers' profiles would be, what methodology would be employed, or what credentials the staff might have. On June 26, 2018 the parents rejected the proposed IEP (covering 4/25/18-4/24/19) and refused the proposed placement, because it failed to offer the residential program that Dr. McCormick had recommended and that David required.

43.     David returned to Franklin for his senior year (2018-2019 school year). He continued to make good academic, social, and emotional progress there, even accepting the need for and benefits of his receiving support services in college that are designed for students with autism.

44.     The parents attempted to resolve the dispute over David's program through mediation and negotiation, without success.

45.     On or about January 3, 2019, David's parents, through their then-attorney, filed a due process hearing request with the BSEA, pursuant to 20 U.S.C. § 1415(f) and M. G. L. c. 71B, § 3. The case (*Student v. Newton Public Schools*, BSEA No. 1905577) was assigned to Hearing Officer Catherine Putney-Yaceshyn. In their hearing request, Mr. and Ms. Doe sought, *inter alia*, a determination that Newton's 3/8/17-3/7/18 and 4/25/18-4/24/19 IEPs and placements denied David FAPE and requested an order requiring Newton to reimburse them for all costs associated with David's Franklin placement and to assume the costs of that placement prospectively.

46.     In February 2019, Dr. Hughes provided a progress note, summarizing her work with David and endorsing his continued need for a residential placement. Dr. Hughes confirmed that David had not reported any suicidal ideation throughout his time at Franklin.

47.     Newton performed a triennial evaluation of David during February 2019. The Team reconvened on March 25, 2019 to consider the evaluation results and develop David's next

IEP.  Newton continued to propose an unspecified day placement.  The next IEP (covering 3/25/19-6/6/19)[3] did not provide any more information than its predecessor had about the proposed day program.  On April 15, 2019, the parents rejected the proposed program and placement.  On the same date, they amended their hearing request to put the 3/25/19-6/6/19 IEP at issue.

48.    The hearing was held on May 20 and 21, 2019.  The record closed with the parties' submission of written closing arguments on July 5, 2019.

49.    On August 9, 2019, the hearing officer issued her decision.  A true copy of the decision is attached as Exhibit A.  The hearing officer concluded that Newton had offered David a FAPE for the 2017-2018 and 2018-2019 school years.  (She failed to rule on the adequacy of the March 2017 and June 2017 IEPs, despite their having been listed in the statement of issues for hearing.)  She therefore denied the parents' request for reimbursement of the costs associated with David's placement at Franklin Academy.

50.    David and his parents are aggrieved by the hearing officer's decision.  The hearing officer erred in many ways, including but not limited to:

a.    Concluding that the full inclusion IEP and placement proposed on or about August 31, 2017 offered David a FAPE, when that conclusion was unsupported by the weight of the evidence;

b.    Failing to determine whether the March 2017 and June 2017 IEPs had offered David a FAPE (which they did not), despite the fact that those issues were included on the hearing officer's list of issues for the hearing;

_____

[3] The IEP was written through June 6, 2019 because David was expected to graduate from Franklin Academy on June 1, 2019.  David did in fact receive his diploma on June 1, 2019, thereby terminating his eligibility for special education.  20 U.S.C. § 1412(a)(1); M. G. L. c. 71B, § 1.

c.      Failing to give proper weight to the information that the parents provided to Newton at the August 31, 2017 Team meeting, including but not limited to David's statement of his intent to kill himself if he were required to return to NNHS;

d.      Placing undue weight on information about the LINKs program and about NNHS measures for students with suicidal intent that was provided at hearing but was unavailable to the parents at the time when they had to decide about Newton's proposed program and placement under the IEP generated after the August 31, 2017 Team meeting, including but not limited to the testimony of Newton staff member Colleen Meigher, who was not invited to attend and did not attend the August 31, 2017 Team meeting, who even at the hearing was unfamiliar with David's IEP and other relevant facts, and whose allegations about LINKs and about NNHS measures for students with suicidal intent were neither available to the parents at or before the August 31, 2017 Team meeting nor available to them as of the time that they were required to respond to the amended IEP that Newton generated on or about September 8, 2017;

e.      Placing undue weight on a vague possibility, advanced by Newton, that David could perhaps attend a program at Newton South High School during the 2017-2018 school year, when no such proposal was ever proposed to the parents in writing via an IEP, as would have been required by IDEA and M. G. L. c. 71B;

f.      Placing undue weight on the concept that Newton's proposed full inclusion program for 2017-2018 would provide David with access to the "least

restrictive environment," while failing to consider or acknowledge all of the features of that environment that had failed to meet and had indeed exacerbated his special needs during the 2015-2016 and 2016-2017 school years, and which would have failed to meet and indeed would have exacerbated his academic, social, and emotional needs during the 2017-2018 school year;

g.    Failing to give proper weight to the recommendations of Dr. Adams, Ms. Lopes, Dr. Palumbo, and Dr. Cotugno regarding David's need for an out-of-district therapeutic placement;

h.    Failing to give proper weight to the evaluation and testimony of Dr. McCormick regarding David's need for residential placement;

i.    Failing to give proper weight to the testimony of Dr. Hughes regarding David's need for residential placement;

j.    Failing to give proper weight to the testimony of Shannon Cove, M.Ed., regarding David's need for a residential placement;

k.    Failing to consider that Newton, by agreeing that David required a specialized out-of-district therapeutic program as of April 25, 2018, at a time when his needs had been partially remediated by the Franklin Academy program, had in effect conceded that its proposed full inclusion IEP failed to provide David with a FAPE for the earlier period from August 31, 2017 through April 25, 2018, when David's needs were more acute;

l.    Concluding that the IEP and day placement proposed on or about April 25, 2018 offered David a FAPE, when that conclusion was unsupported by the weight of the evidence;

m.      Concluding that the IEP and day placement proposed on or about

March 25, 2019 offered David a FAPE, when that conclusion was unsupported by

the weight of the evidence;

n.      Ignoring or mischaracterizing evidence relevant to each of the

foregoing issues; and

o.      Failing to consider the reasonableness of the parents' placement of

David at Franklin Academy during each of the IEP periods at issue.

The foregoing list is provided for purposes of illustration only and is not intended to limit the

issues that the plaintiffs may raise on this appeal.

## COUNT ONE
## Individuals with Disabilities Education
## Act, 20 U.S.C. § 1415(i), and M. G. L. c. 71B, § 3

51.      The plaintiffs reallege and incorporate herein by reference the allegations

contained in Paragraphs 1 through 50 of their Complaint.

52.      The hearing officer's decision contains errors of law and fact, and is unsupported

by a preponderance of the evidence.

53.      The hearing officer's decision is arbitrary, capricious, an abuse of discretion, and

otherwise not in accordance with law.

54.      The hearing officer's decision violates the plaintiffs' rights to due process of law.

55.      The hearing officer's decision ignores or misapplies relevant precedent, including,

*inter alia*, the decisions of the United States Supreme Court in *Endrew F. v. Douglas County*

*School District RE-1*, 137 S. Ct. 988 (2017), and *Florence County School District Four v.*

*Carter*, 510 U.S. 7 (1993).

56.     Without limiting the generality of the foregoing, the plaintiffs object, *inter alia*, to the following portions of the hearing officer's decision:

a.      The portion of the decision that holds that Newton's 3/8/17-3/7/18 IEP (as amended) and its proposed full inclusion placement at NNHS for that period offered David a FAPE;

b.      The portion of the decision that holds that Newton's 4/25/18-4/24/19 IEP and its proposed out-of-district day placement for that period offered David a FAPE;

c.      The portion of the decision that holds that Newton's 3/25/19-6/6/19 IEP and its proposed out-of-district day placement for that period offered David a FAPE;

d.      The portion of the decision that refused to consider the reasonableness of the parents' placement of David at Franklin Academy during each of the IEP periods at issue; and

e.      The portion of the decision that holds that Newton is not financially responsible for the costs associated with David's Franklin Academy placement during the 2017-2018 and 2018-2019 school years.

57.     The plaintiffs ask that the Court reverse the portions of the decision and orders specified in the preceding paragraph (including all subparts of that paragraph),[4] and issue an order finding that Newton failed to provide David with a FAPE during each of the 2017-2018 and 2018-2019 school years.  Plaintiffs also seek a declaration that the parents acted reasonably in placing David in the Franklin Academy residential program for each of the 2017-2018 and 2018-2019 school years.  The plaintiffs further seek an order requiring reimbursement of all

---

[4]  The plaintiffs specifically do not seek reversal of the findings and conclusions set forth in footnote 23 of the decision concerning Newton's flawed attempt to propose an extended evaluation of David during the fall of 2017.  The plaintiffs submit that the findings and conclusions set out in footnote 23 are correct.

expenses that the parents incurred in connection with David's Franklin Academy program and placement (including, but not limited to, residential tuition and necessary transportation) during the periods at issue.

WHEREFORE, the plaintiffs request that the Court:

A.    Receive the records of the administrative proceeding and hear additional evidence as appropriate;

B.    Reverse all portions of the hearing officer's decision and order specified in Paragraph 56 of their Complaint (including all subparts of that paragraph);

C.    Issue an order finding that Newton failed to provide a FAPE to David for each of the 2017-2018 and 2018-2019 school years; that the parents acted reasonably in placing him in the Franklin Academy residential program for each such school year; and that Newton must reimburse Mr. and Ms. Doe for all expenses connected with that program (including, but not limited to, residential tuition and necessary transportation) for each of the 2017-2018 and 2018-2019 school years;

D.    Award the plaintiffs their reasonable attorneys' fees and related costs and expenses, pursuant to 20 U.S.C. §1415(i)(3), including such fees, costs, and expenses as were incurred at the administrative level and such fees, costs, and expenses as may be necessitated by this action; and

E.    Grant such other and further relief as the Court deems just.

JOHN DOE, JANE DOE, and
DAVID DOE

By their attorneys,


*/s/ Eileen M. Hagerty*
Eileen M. Hagerty (#216490)
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, Massachusetts 02114
Telephone: (617) 227-7031
Fax: (617) 367-2988
ehagerty@kcslegal.com

Dated:  November 7, 2019