UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOHN DOE, JANE DOE, and DAVID DOE, )
                                )
            Plaintiffs,         )
                                )         Civil Action
v.                              )         No. 19-12293-PBS
                                )
NEWTON PUBLIC SCHOOLS and BUREAU )
OF SPECIAL EDUCATION APPEALS,   )
                                )
            Defendants.         )
_____)
```

**MEMORANDUM AND ORDER**

May 3, 2021

Saris, D.J.

**INTRODUCTION**

Plaintiffs John and Jane Doe, along with their son, David Doe, challenge a decision by a hearing officer at the Bureau of Special Education Appeals of the Massachusetts Division of Administrative Law Appeals (BSEA). The hearing officer found that Newton Public Schools (Newton) had provided David, who is autistic, with a "free appropriate public education" as required under the Individuals with Disabilities Education Act (IDEA). See 20 U.S.C. § 1400(d)(1)(A). The Does unilaterally placed their son in an out-of-state residential therapeutic school after his sophomore year in Newton North High School (Newton North) because he had been treated and hospitalized for suicidal thinking over the summer. He refused to return to Newton North because he felt he

1

was being bullied.  Plaintiffs argue that the full-inclusion program which Newton North proposed to deal with his problems did not provide an appropriate level of therapeutic and other services necessary to provide meaningful access to the academic curriculum.

As relief, the Does request that the Court reverse all portions of the BSEA hearing officer's decision and order, issue an order finding that Newton failed to provide a free appropriate public education to David, require Newton to reimburse their expenses related to sending David to Franklin Academy, and award Plaintiffs reasonable attorneys' fees and costs.

For the reasons stated below, the Court **ALLOWS** in part the Does' motion for summary judgment (Dkt. No. 60) but excludes from reimbursement the costs of boarding and out-of-state travel.  The Court concludes that the cost of a private residential school (as opposed to an out-of-district day therapeutic program) was unreasonable.  The motions for summary judgment filed by BSEA and Newton (Dkt. Nos. 58 and 59) are accordingly **DENIED** in part.

**BACKGROUND**

I.   **Statutory Framework**

A.   **The Individuals with Disabilities Education Act (IDEA)**

The IDEA, 20 U.S.C. §§ 1400 et seq., seeks to "ensure that all children with disabilities have available to them a free appropriate public education (FAPE)."  20 U.S.C. § 1400(d)(1)(A).  Massachusetts law similarly requires that school committees

provide students with a FAPE as defined under the IDEA.  Mass.
Gen. Laws ch. 71B, § 1.  "FAPE" is defined as:

> special education and related services that—
>
> (A)  have been provided at public expense, under public
>      supervision and direction, and without charge;
>
> (B)  meet the standards of the State educational agency;
>
> (C)  include an appropriate preschool, elementary
>      school, or secondary school education in the State
>      involved; and
>
> (D)  are provided in conformity with the individualized
>      education program required under [20 U.S.C.
>      §] 1414(d).

20 U.S.C. § 1401(9).  "Related services" includes counseling and
psychological services "as may be required to assist a child with
a disability to benefit from special education."  20 U.S.C.
§ 1401(26)(A).

20 U.S.C. § 1401(9)(D) requires that a FAPE be provided "in
conformity with the individualized education program [IEP]
required under section 1414(d) of [the IDEA]."  An IEP consists of
"a written statement for each child with a disability" that
includes, inter alia

> a statement of the child's present levels of academic
> achievement and functional performance . . .;
> a statement of measurable annual goals . . .;
> a statement of the special education and related
> services and supplementary aids and services, based on
> peer-reviewed research to the extent practicable, to be
> provided to the child, or on behalf of the child.

20 U.S.C. § 1414(d)(1)(A)(i).  "The instruction offered [through an IEP] must be specially designed to meet a child's unique needs." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017) (cleaned up).  "The development of an IEP requires the participation of a team of individuals, including the parents, the child's teacher, designated specialists, and a representative of the [local education agency]."  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 988 (1st Cir. 1990) (citations omitted).

The Supreme Court has described the IEP as "[t]he primary vehicle for implementing [the] congressional goals" behind the IDEA and the concept of a FAPE.  Honig v. Doe, 484 U.S. 305, 311 (1988).  In this context, an IEP must ensure the "opportunity for meaningful educational benefit."  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 32 (1st Cir. 2012) (internal quotation marks omitted).  Under the IDEA, a State is not required to "maximize the potential of handicapped children commensurate with the opportunity provided to other children."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 189-90 (1982) (cleaned up).  The question, rather, is whether the IEP was "reasonably calculated" to provide a FAPE.  See Roland M., 910 F.2d at 992 (cleaned up).  Accordingly, "courts have concluded that a FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice,

or even the best choice." G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (emphasis in original).

### B.   Mainstreaming Provision

"Mainstreaming" of students is preferred under the IDEA, Roland M., 910 F.2d at 987, which requires that students be educated in the "[l]east restrictive environment," 20 U.S.C. § 1412(a)(5). Education in the "[l]east restrictive environment" means that

> [t]o the maximum extent appropriate, children with
> disabilities, including children in public or private
> institutions or other care facilities, are educated with
> children who are not disabled, and special classes,
> separate schooling, or other removal of children with
> disabilities from the regular educational environment
> occurs only when the nature or severity of the disability
> of a child is such that education in regular classes
> with the use of supplementary aids and services cannot
> be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). In light of this so-called mainstreaming provision, local education agencies may recommend a residential placement in an IEP only where the student "would not make educational progress in a day program." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (cleaned up).

### C.   Unilateral Placement in a Private School

The IDEA provides that, under some circumstances, parents may be reimbursed for the education of a child enrolled in a private school "without consent of or referral by the public agency." 20 U.S.C. § 1412(a)(10)(C)(ii). Specifically, reimbursement for the

costs of private schooling is available where a "court or hearing officer finds that the [public] agency had not made a free appropriate public education available to the child in a timely manner prior to [the] enrollment [in private school]." Id.

The cost of reimbursement may be reduced or denied, however, "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III). Courts, moreover, are empowered by the IDEA to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and may consider equitable factors in fashioning relief, see Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 15-16 (1993). These discretionary powers are broad, and they permit a court to reduce reimbursement "if the court determines that the cost of the private education was unreasonable." Id. at 16.

**D.   Hearing Process**

If a complaint about an IEP arises, the State must convene an "impartial due process hearing." 20 U.S.C. § 1415(f)(1)(A). In Massachusetts, such hearings are performed by the BSEA. Roland M., 910 F.2d at 988 (citing Mass. Gen. Laws ch. 15, § 1M).

The outcome of the BSEA hearing is reviewable in federal court. Id. The reviewing court's "focus is upon the educational program which finally emerges from the administrative review process, not the IEP as originally proposed." Id. (citation

omitted).   Moreover, the Court must judge the IEP based on the information that was available at the time the IEP was developed. "An IEP is a snapshot, not a retrospective." Id. at 992.   This means that "[i]n striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." Id. (citations omitted).

If the Court finds that the IEP was not appropriate, it must then determine whether the private program was appropriate. See Florence Cty., 510 U.S. at 12.   Upon such a finding, the Court may order the school district to reimburse the parents for some or all of the cost of the private program, as described above. See id.

## II.  **Factual Background**

The following facts are derived from the parties' statements of facts and associated exhibits, as well as the hearing officer's opinion. Except where otherwise noted, they are undisputed.

### A.   **Freshman Year (2015–2016)**

David has received special education services since he was in kindergarten, and his IEPs from third grade onwards identified autism as David's primary disability.   A neuropsychological evaluation report shows that David has also been diagnosed with major depression and an anxiety disorder.   The services provided to David in elementary school included inclusion support, occupational therapy, social pragmatics instruction, and adaptive

physical education.  David began reporting suicidal ideation in middle school and started working with a therapist, but the therapist ultimately recommended that the services be discontinued due to David's resistance to them.

In ninth grade, in 2015, David joined Newton North. At the Does' request, David's ninth-grade IEP eliminated many of the support services that he had received in middle school, including instructional modifications, David's daily academic support class, and inclusion support.  David also underwent an evaluation by Dr. Colleen Meigher, a Newton school psychologist, who met with him for approximately two to three hours in January 2016.  David enrolled in courses at the Advanced College Prep level, but he was not enrolled in any Honors-level courses.  He participated in extra-curriculars, including cross country and Model U.N.

David's next IEP covered the period from March 29, 2016 to March 28, 2017.  In preparation for David's March 2016 IEP meeting, his teachers indicated in assessment forms that David struggled with memory problems, slow processing speed, failure to finish assigned tasks, difficulty dealing with large class sizes, and difficulty working independently.  The assessment forms showed that David was receiving grades ranging from A to B- at the time of the evaluation.  The resulting IEP provided for regular consultation and services by a speech pathologist in social pragmatics.  It also provided for other academic supports,

including accommodations for test-taking; access to a keyboard for note taking; extended time for completing assignments and tests; extensions for long-term writing assignments as needed; clear statements of classroom instructions, assignments, and due dates; encouragement for self-advocacy; and support in explaining directions, unfamiliar tasks, etc.  David's parents accepted the IEP in full.

### B.    Sophomore Year (2016-2017)

In tenth grade (2016-2017), David enrolled in two Honors-level classes.  David also continued to participate in social pragmatics sessions, but his speech language pathologist reported that he attended the sessions "begrudgingly."  Dkt. 26-1 at 113. David had told the speech language pathologist that he felt stigmatized by being in an IEP program and did not believe that he needed social pragmatics support.

In January 2017, David's Latin teacher wrote a letter to David's guidance counselor, which the teacher then forwarded to David's parents.  The letter explained that David had reported to the teacher that he was "drowning" due to his two Honors-level classes, and that he was getting little sleep and was often sick. When David's teacher suggested to David that he could change his schedule, David explained that he could not drop Honors math because he would then not be eligible to go to a "good college." Dkt. 26-1 at 114.  John Doe responded to the letter, explaining

that the teacher was "preaching to the choir" and that he and Jane
Doe had tried to convince David to not enroll in Honors math and
had attempted to convince David to meet with an outside
psychologist. Id.

In February 2017, the Does sent an email to David's speech
language pathologist and his guidance counselor expressing doubt
that the upcoming IEP Annual review meeting would be productive.
They further explained that they were considering vetoing David's
enrolment in Honors-level courses the following year. In or around
March 2017, the Does emailed David's guidance counselor requesting
that David's teachers deny him the opportunity to enroll in "too
high-level classes." Dkt. 26-1 at 114.

In March 2017, David met with his IEP Team, where he was
informed that his teachers would not be recommending him for
Honors-level classes the following year. David became upset,
breaking down in tears and saying, "[d]on't do this to me. I have
nothing now." Dkt. 71 ¶ 25. Pursuant to this meeting, David's
Team proposed an IEP with an added goal in the area of planning,
organizing, and strategizing. David's guidance counselor
testified that the Does apparently believed that David would be
resistant to any additional services being added to his IEP.

David continued to struggle to accept his academic and social
challenges. On March 21, 2017, David informed his parents that he
wanted to kill himself by jumping out of the fourth-floor window

of a building at Newton North.  David's parents sought an emergency meeting with David's guidance counselor but did not call a doctor or 9-1-1.

On March 23, 2017, David's parents brought him to Riverside Emergency Services for a safety evaluation.  At Riverside, David denied suicidal intent and reported that he would not act on suicidal ideation.  He explained that his teachers had recommended that he not enroll in Honors-level classes the previous week and reported that "the only thing I have going for me is that I am in some Honors classes."  Dkt. 26-1 at 115.  The Riverside staff did not find that David was in immediate danger of harming himself and sent him home.  David's parents subsequently found a private therapist, Dr. Albert Cotugno, who began to meet with David weekly.

The spring of David's sophomore year was also punctuated by two major social incidents that led to a deterioration in David's mental well-being.  First, in May 2017, David was not elected to a leadership position in Model U.N.  In an email to David's guidance counselor, David's parents explained that David had become "ill" over the results of the election and was unable to attend school the next day as a result.  Then David's social struggles worsened when he reported to school authorities that a fellow student had a stolen copy of an Honors chemistry exam and posted it in a chat room.  After members in his study chatroom

were notified of his actions, he was verbally threatened by several students.

### C.   Summer Before Junior Year (2017)

In June 2017, David's Team reconvened to review his March IEP.  They proposed adding academic support with a special education teacher to David's schedule, and they also proposed continuing social pragmatics.  The Team did not include counseling in the IEP.  One of David's teachers recalled that counseling was excluded from David's program because of David's resistance to such services.

In July 2017, David's parents discovered a large bottle of Tylenol in David's room.  David admitted he had taken the Tylenol with the intent of using it to commit suicide.  The Does made an appointment for David at the Lurie Center for Autism at Massachusetts General Hospital.  David was evaluated by Dr. Michelle Palumbo, a psychiatrist, who found that David presented with symptoms of "major depressive disorder, severe, with active suicidal ideation and a history of suicidality ideation with plan." Dkt. 26-1 at 118.

On July 19, 2017, the Does emailed members of David's IEP team at Newton and informed them of David's hospitalization and his opposition to returning to Newton North.  They also reported that David had been bullied at Newton North.  On July 26, 2017, twelve days after he was first hospitalized in a locked pediatric

ward, David was discharged from North Shore Medical Center and admitted for treatment at McLean Southeast Adolescent Residential Program ("McLean") in a full hospital setting where he remained until August 9, 2017.   His discharge notes explain that his depressive symptoms had begun to ameliorate, and that David was open the possibility of attending a therapeutic high school instead of Newton North.

Upon his release, David's clinicians at McLean, child psychiatrist Peter Adams and social worker/case manager Catherine Lopes, determined that David would require "extensive therapeutic support in order to be able to access the academic curriculum at any level" and recommended that he attend a therapeutic school. Dkt. 26-8 at 155. They explained:

> [David] would benefit from a program with experience in working with teens with high functioning Autism spectrum disorder and ongoing mood crises.   [David] will need daily mental health check-ins and therapy support. [David] will need to have access to staff and therapeutic supports in order to develop flexibility of thinking, and combat his current thought rigidity that: school performance is the only predictor of a life worth living. Secondarily, [David] would benefit from learning healthy coping skills to manage mood crisis, rejection and unwanted feelings. We strongly recommend [David] be considered for services offered at a therapeutic school given his ongoing emotional difficulties, coupled with suicidal thinking, which will continue to require intensive interventions.

Dkt. 26-8 at 155.

With the help of a hired educational advocate, the Does began looking at special day and residential schools for David.  One was

Franklin Academy.  Franklin, a college preparatory school, was designed to educate children diagnosed with autism spectrum disorders.  Many Franklin students also present with depression and anxiety and report bullying in their past schools.  The classes at Franklin are small, with approximately seven students per class.  Each student receives a team, including a counselor, learning specialist, residential dean, and four subject teachers.  The team meets three times per week to discuss the student's progress and each team has a designated liaison to provide updates to the parents.

Notably, Franklin is also a residential school, offering a boarding program to its students in Connecticut.  The Does had focused their search on residential schools because David had failed to make friends at Newton North.  They believed that David, who had spent most of his free time in his room studying, could learn about friendship only at a residential program, where skilled staff were available to instruct in social pragmatics.  The Does also, however, simultaneously looked at some therapeutic day programs, including Beacon High School, which is in-state.

On August 18, 2017, the Does sent an email to Newton rejecting the proposed IEP and placement from June 2017, explaining that they believed that David required an appropriate therapeutic placement.  The Does requested a meeting to discuss the rejected IEP and a new approach to David's education.  On August 25, 2017,

the Assistant Special Education Department Head of Newton North emailed the Does and members of David's IEP Team, offering a meeting with the Does to discuss the rejected June IEP.   When David's parents accepted the invitation, they attached a copy of the letter from Adams and Lopes recommending that David enroll in a therapeutic schooling program.

### D.   The August 31, 2017 IEP Meeting

David's IEP Team met on August 31, 2017 to discuss the rejected June 2017 IEP and to address David's suicidal ideations and recent hospitalization.  None of the clinicians who had treated David over the summer were present.  Newton proposed that David receive increased speech and language services and that he receive additional academic support as part of a revised IEP.  It also proposed that David participate in Newton North's LINKs program, a special education program.  According to the hearing officer, Mr. Heslin, a former co-director of the LINKs program, explained that LINKs was a therapeutic program that provided individual and group counseling.  The parties dispute how the LINKs program was specifically described during the August 2017 IEP meeting.  The Does assert that their patient advocate asked many questions about LINKs but that Newton was unable to answer most of her questions. They further contend that at no point was LINKs referred to as "therapeutic" during the meeting.   Newton disputes these

characterizations of the meeting and asserts that LINKs is a therapeutic placement.

At the end of the meeting, the Does' advocate informed Newton that they intended to place David at Franklin Academy and would be requesting reimbursement for the school's tuition.

### E.   The August 31, 2017 IEP

In addition to proposing David's enrollment in the LINKs program, the proposed IEP resulting from the August 31, 2017 meeting consisted of the following services for David:

- Four sessions of 60 minutes each per five-day cycle of academic support
- Two sessions of 30 minutes each per five-day cycle of counseling services
- One session of 50 minutes per five-day cycle of social pragmatics.

The IEP further provided for the following consultation services, which are indirect services to school personnel and parents:

- One session of 30 minutes per month of social pragmatics consultation
- One session of 15 minutes per month of academic support consultation

### F.   Enrollment in Franklin Academy

David applied to Franklin on August 26, 2017, and he was accepted on August 29, 2018.  By August 30, 2017, David's parents had emailed some of the private schools with which they had communicated to inform them that David had accepted an offer at

Franklin.  The Does then confirmed their acceptance via a deposit on September 3, 2017.

### G.   Newton Denies Funding for Franklin Academy

On or after September 11, 2017, Newton administrators sent the Does a letter denying their request for funding for David's enrollment at Franklin Academy.  In the letter, Newton also proposed an evaluation of David in a 45-day assessment program. On October 16, 2017, the Does' attorney sent a renewed request to Newton to support David's placement at Franklin, emphasizing his emotional distress and that the LINKs program and proposed IEP were insufficient to meet his needs.  The Does formally rejected the proposed August 31, 2017 IEP and declined to release David's information to extended evaluation programs.

### H.   Junior Year (2017-2018)

Although David's transition to Franklin Academy was rocky, marked by anxiety around getting into college and lingering resentment towards Newton North, the mental health professionals who supported him during his junior year observed some progress in his mental and emotional state.  Shannon Cove, a learning specialist on David's eleventh grade team at Franklin, reported that she worked with David to encourage him to spend more time socializing instead of studying in his bedroom in the evenings. As David began gradually interacting with more students, he developed a social group of classmates with whom he ate lunch and

socialized during his free time.  Although Cove observed that David remained rigid and continued to struggle after his junior year, she nevertheless believed that David benefitted from the residential aspect of Franklin.

David received individual counseling from a school counselor at Franklin, and he also began seeing a private therapist, Dr. Barbara Hughes.  Although Dr. Hughes observed that David continued to face significant challenges, she also believed that David had made progress during his first year at Franklin, noting, for instance, that David had organized a Model U.N. club at the school.

## I.    The April 25, 2018 IEP

In February 2018, the Does had David evaluated by Jason McCormick, a neuropsychologist and expert in children and young adults with autism.  Dr. McCormick determined that David needed to be placed in a specialized education program in a residential setting.  Dr. McCormick thought that it was essential that David receive "in-the-moment" instruction of social, emotional, and executive functioning skills and noted that David's social challenges were "inextricably linked" to his emotional distress. Dkt. 26-9 at 141–42. Dr. McCormick thus found residential placement necessary based on David's need for continuous social and emotional support.

On April 25, 2018, David's IEP Team met for an annual review and to discuss Dr. McCormick's evaluation.  The IEP proposed that

David be placed in an unspecified "Out of District Private/Public Day" school that would allow "all IEP services [to] be provided outside the general ed. classroom and in a separate school that only serves students with disabilities."[1]  Dkt. 26-10 at 2.   In contrast to Dr. McCormick's recommendation, the IEP did not recommend that David be placed in a residential program.   On June 26, 2018, the Does rejected the April 25, 2018 IEP, feeling that David needed to continue his placement at Franklin in its residential program.

**J.   Senior Year (2018-2019)**

David remained at Franklin Academy for his senior year of high school.  He participated in the Franklin Learning Institute program, which offers high school seniors a college-like experience.  When David met with Dr. Palumbo in December 2018, he reported that he was doing well at Franklin, and that he had developed friendships and better sleeping and eating habits.

**K.   The March 25, 2019 IEP**

On March 25, 2019, David's IEP Team reconvened to produce a final IEP for David.  The IEP team continued to propose that David be placed in a therapeutic day program, consistent with its

---

[1] A separate section of the IEP indicated that David should be placed a "[p]ublic" "[s]eparate [d]ay [s]chool." Dkt. 26-10 at 2. The parties do not discuss this language from the IEP and Newton and BSEA have admitted that the IEP Team proposed that David be placed in an "Out of District Private/Public Day."

recommendation in the prior year. The Does rejected this recommendation.

### L.   The Due Process Hearing

The Does filed a due process hearing request with the BSEA pursuant to the IDEA. The hearing before the BSEA took place on May 20, 2019 and May 21, 2019 and included discussion of the three most recent IEPs outlined above. On August 9, 2019, the hearing officer issued her decision, which held that Newton had offered a FAPE for the 2017-2018 and 2018-2019 school years, thus denying the Does reimbursement of the costs associated with David's placement at Franklin Academy. On November 7, 2019, the Does initiated this action appealing the officer's decision.

### LEGAL STANDARD

"District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review." Johnson v. Bos. Pub. Sch., 906 F.3d 182, 190 (1st Cir. 2018). Under this standard,

> [a] district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.

Id. (citing D.B. ex rel. Elizabeth B., 675 F.3d at 35–36 (alteration in original)). "This intermediate level of review

reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena." Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83–84 (1st Cir. 2004) (citations omitted).

The IDEA provides that, "basing its decision on the preponderance of the evidence, [the reviewing court] shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Thus, if a court holds that the public placement violated the IDEA, the court is empowered to weigh equitable considerations in fashioning relief. Florence Cty., 510 U.S. at 15–16. Indeed, "[c]ourts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." Id. at 16. This means that "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." Id.

## ANALYSIS

### I.   Whether the August 31, 2017 IEP Provided a FAPE

Newton and BSEA argue that the August 31, 2017 IEP was appropriate and was reasonably calculated to provide David with meaningful educational benefits in the least restrictive environment. In support of this contention, they point to evidence that (1) none of David's clinical treatment providers attended the

IEP meeting; (2) although a letter from David's physicians at McLean recommended that David attend a therapeutic school, the letter did not discuss any recommendations that David enroll in a residential program; (3) the team responsible for crafting the IEP proposed to increase social pragmatics and counseling support; and (4) the team recommended David's placement in the LINKs program, which would provide David with adequate special education services at Newton North.

The Does, on the other hand, argue that (1) the hearing officer failed to give due weight to David's needs; (2) the hearing officer ignored evidence showing that the Does were provided with little information about the LINKs program, that David would have spent little time in LINKs, and that the program was inappropriate for David; (3) the hearing officer erroneously relied on information presented by Newton two years after the IEP was produced, which was not available at the time; (4) the hearing officer misapplied the "least restrictive environment" principle; and (5) that, by adopting the April 25, 2018 IEP, Newton effectively conceded that the August 31, 2017 IEP was inadequate.

The Does have presented sufficient evidence to prove by a preponderance of the evidence that the information available to David's IEP team before the August 31, 2017 IEP was produced supported David's placement in a therapeutic program. They have also demonstrated that the program offered by Newton in the IEP

22

was inadequate to meet this need.  To begin, the clinicians who had treated David at McLean, Dr. Adams and Lopes, expressed in no uncertain terms that David "be considered for service offered at a therapeutic school given his ongoing emotional difficulties, coupled with suicidal thinking, which will continue to require intensive interventions."  Dkt. 26-8 at 155.  They further determined that, due to David's thinking patterns, including "thought rigidity . . . around school performance and rigor and suicide," David would require "extensive therapeutic support in order to be able to access the academic curriculum at any level." Id.

Although the hearing officer's decision cited these recommendations, the officer failed to adequately explain why she discredited them.  Instead, the officer determined that Newton's recommendation to place David in the LINKs program was reasonably calculated to provide David with a FAPE in the least restrictive environment.  This conclusion was largely based on the testimony of Dr. Meigher, the Newton school psychologist with a specialty in suicide prevention, who had conducted a psychological evaluation of David as part of his three-year evaluation.  According to Dr. Meigher, LINKs would provide David with adequate therapeutic support and a "home base" during the day as well as individual and group counseling.  Dkt. 26-1 at 121.  Under Newton's proposal, David would still go to mainstream academic classes at Newton

North.   The hearing officer concluded that Dr. Meigher had "credibly testified that the LINKs program could meet [David]'s therapeutic needs," citing evidence that David could "participate in both individual and group therapy" as a student in LINKs and would be able to "leave the LINKs classroom to receive academics at a higher level . . . and still return to the LINKs classroom at any time during the day."  Id. at 130.

But, as the Does point out, Dr. Meigher testified that she had seen David for only one psychological evaluation, in 2016, during his time at Newton.  She did not see him after his mental health crisis in the summer of 2017.  And although Dr. Adams and Lopes from McLean were not present at the August IEP meeting, Dr. Meigher was not present either.  The clinicians at McLean who wrote the letter strongly recommending a therapeutic school placement for David were responsible for David's psychiatric care during the events of the summer leading to his unilateral placement, and they were better positioned than Dr. Meigher to understand David's needs at the time that the August 31, 2017 IEP was developed. On the whole, the hearing officer's failure to explain adequately why she discredited the McLean clinicians' recommendations in favor of Dr. Meigher's opinion undermines her decision.

One key question addressed by the hearing officer was whether the LINKs program would have provided enough therapeutic support to David.  Based on Dr. Meigher's testimony, the hearing officer

reasonably could find that David would have received some therapeutic benefit from having enrolled in the program. But the LINKs program would nevertheless have required David to continue participating in the full-inclusion model at Newton North, rather than taking classes at a "therapeutic" school with daily mental health check-ins and therapy support, as was "strongly" recommended by his McLean clinicians. Dkt. 71 at 24. Indeed, the Does have calculated that David would have spent less than 21% of school hours outside the general education classroom while in LINKs[2].

---

[2] The brochures about LINKs included in the administrative record paint an inconsistent picture.  One brochure for the LINKs program states that it provides "a highly supportive and flexible environment to support students with emotional disabilities." Dkt. 26-9 at 25.  It further explains that the program "provides wraparound services and supports to engage students and support consistent attendance and engagement in all aspects of the educational environment."  Id.  The brochure goes on to convey that the program includes special education teachers, small class sizes of eight to twelve students, and classes in English, history, math and physical education offered at the college-prep level (the lowest track of classes offered at Newton North).  The Does complain they were not fully informed about the LINKs process during the August 2017 IEP meeting.  They argue the second brochure indicates that the LINKs program's primary focus is on correcting attendance issues, explaining that the "LINKs program supports students with chronic attendance problems who are at risk of not graduating within four years.  Many students receive special education services to address emotional disabilities." Id. at 26.  The brochure continues: "Students participate in a behavior system that is designed to promote consistent attendance."  Id.  The two brochures differ significantly in emphasis; which description is more accurate is not entirely clear.  The Does contend that they believed that the LINKs program was not appropriate for David's needs because it was focused on attendance.

Based on an intermediate level of review, I find that the IEP in August 2017 was not adequate given David's severe mental health needs and crisis during the summer of 2017. This conclusion is buttressed by Newton's decision in the two subsequent IEPs to recommend that David be placed in an out-of-district public/private day school. As the Does point out, Newton had little new information about David between the August 31, 2017 IEP and the April 25, 2018 IEP, aside from Dr. McCormick's letter advocating for a residential placement for David and follow-up letters from David's doctors, Dr. Cotugno and Dr. Palumbo. These letters did not express that David had experienced any major changes in status since the August 31, 2017 meeting. Newton and BSEA have not adequately explained why David would have been entitled to placement in an out-of-district public/private day school in April 2018 but not in August 2017.

## II. **Whether David's Placement at Franklin was Appropriate**

The next question is whether David's placement at Franklin Academy, an expensive, out-of-state residential program, was appropriate. On the whole, the record shows that Franklin Academy provided David with the therapeutic support that he needed, through trained and experienced staff, therapeutic counseling, small class sizes, and teaching of metacognitive skills.

Although Newton asserts that Franklin Academy's report cards "lack goals, objectives, and any measurable data or information to

determine if students made progress," Dkt. 69 ¶ 89, Franklin's curriculum need not necessarily meet state education standards, see Florence Cty., 510 U.S. at 14 (noting that "reimbursement is [not] necessarily barred by a private school's failure to meet state education standards").  And the record shows that David's move to Franklin resulted in significant benefits to his mental health, with his clinicians testifying that his anxiety and depression had improved since he started as a student there.

Newton further argues that Franklin was inappropriate "because it did not provide David with the embedded and cohesive therapeutic services and programming, such as individual counseling, as recommended by David's clinicians and Dr. McCormick."  Dkt. 64 at 17.  Although David did seek private therapy from Dr. Hughes during his time at Franklin, the Does point out that he also received individual counseling from school staff, including a school counselor who was available to meet with David and was supervised by Franklin's clinical director.

I note that the least-restrictive environment principle, or the "mainstreaming" provision of the IDEA, did not require the Does to place David in the least restrictive environment if an IEP does not provide FAPE.  As the Second Circuit in Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006), explained, "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate

public education," and therefore "parents may not be subject to the same mainstreaming requirements as a school board." Id. at 364 (cleaned up). See also Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (upholding the district court's reasoning that "imposition of the least-restrictive environment requirement on private placements would vitiate the parental right of unilateral withdrawal"). Franklin was not the least-restrictive environment for David because it was a residential school in a different state, but this does not bar reimbursement under the IDEA.

### III. Whether the April 25, 2018 IEP and the March 25, 2019 IEP Provided a FAPE

The next issue is whether the subsequent IEPs produced by Newton provided David with a FAPE. Both the April 25, 2018 IEP and the March 25, 2019 IEP recommend that David be placed in an "Out of District Public/Private Day" school. Dkt. 71 ¶ 99, 112. The first question is whether these two IEPs should have recommended a residential placement for David. Newton and BSEA argue that the recommendation of a residential placement would have been inappropriate based on the least-restrictive environment principle, which generally favors day school placements over residential placements. See Lenn, 998 F.2d at 1086 (explaining that the IDEA's preference for mainstreaming means that "a student who would make educational progress in a day program is not

28

entitled to a residential placement even if the latter would more nearly enable the child to reach his or her full potential" (cleaned up)).

The Does argue that David's residential placement was necessary because David required a great deal of structured support in order to socialize with his peers.  They principally rely on the evaluation provided by Dr. McCormick, which advocated for a residential placement for David.  The letter had explained that "in addition to social pragmatic and social thinking work during the school day, [David] requires social programming both during and after traditional school hours."  Dkt. 26-9 at 142. It further articulated that

> [David]'s one-track focus on academic success, coupled with his fear of rejection[,] drove him to self-isolate after school, seating himself alone in his room with his homework rather than spending time with his peers.  Thus, it is unrealistic to believe that [David] would—even if extended day services were to be offered—participate in unstructured social activities.  Thus, [David]'s need for social instruction throughout the entire day, coupled with the near certainty that he would not participate in unstructured social activities were he to be placed in a day program, necessitates his placement in a residential setting, one that teaches and reinforces social thinking/social pragmatic skills during school hours and, with the help of trained residential staff, during after school hours.

Id.

Dr. McCormick's evaluation provides some support for the Does' argument that David required residential education.  The hearing officer, however, expressly entertained Dr. McCormick's

evaluation and determined that it was unpersuasive because his conclusion that David would not participate in social activities in a day school placement was too speculative.  The hearing officer also noted that Dr. McCormick's opinion was not shared by any of the Newton teachers who worked with David nor with any of his other clinicians and that Dr. McCormick never observed David outside his office.  Because the hearing officer's finding is subject to an "intermediate" standard of review, see Johnson, 906 F.3d at 190, and because her conclusion is adequately supported by facts in the record, I find that she did not err in dismissing Dr. McCormick's recommendation that David be placed in a residential setting.

The Does' second major argument is that David would have suffered emotionally and academically had he transferred from Franklin Academy to another therapeutic school.  This contention provides a stronger basis for concluding that the April 25, 2018 IEP and the March 25, 2019 IEP did not provide David with a FAPE. As the Does point out, Dr. McCormick, Dr. Hughes, and Cove each expressed that David was not ready to leave Franklin Academy after his junior year.  Before the hearing officer, Dr. McCormick testified that he "would be concerned that the skills weren't consolidated, and to then move [David] from that setting [Franklin Academy], where he demonstrably was making social and emotional gains, to then a different—yet a different setting . . . I would be concerned that some of those gains would be unraveled."  Dkt.

26-3 at 13.   Dr. Hughes testified that, based on her work with David over two years, she did not think that David would have been ready to transition to a day therapeutic placement after his first year.   Cove expressed that she would have been "very concerned" about David leaving Franklin Academy after his first year.   Dkt. 26-4 at 82.

Although this testimony was not available to David's Team at the time of the April 25, 2018 IEP meeting and the March 25, 2019 IEP meeting, the testimony nevertheless speaks to the common-sense notion that removing a student like David from a supportive academic environment would likely pose emotional and social disruption.   I determine, on this basis, that the April 25, 2018 IEP and the March 25, 2019 IEP did not provide David with a FAPE.

I note that Newton correctly cautions against a blanket rule allowing any student to remain in a private unilateral placement because transitioning away from the placement would be disruptive. But, by the same token, David should not be punished for enrolling at Franklin Academy after we was denied a FAPE through the August 31, 2017 IEP.   This ruling must therefore be limited to the facts of David's case.   Newton's failure to provide David with a FAPE in the first instance, through the August 31, 2017 IEP, is what rendered the following proposals to transfer David to a therapeutic day program inappropriate.

**IV.   <u>Relief</u>**

The final question that I consider is what relief is appropriate. The Does seek full reimbursement for the cost of sending David to Franklin Academy, including for the cost of his out-of-state travel expenses. In light of the above conclusion that David did not require a residential placement, however, I determine that any boarding and travel costs should be excluded from reimbursement. See Florence Cty., 510 U.S. at 16 (explaining that a court may reduce reimbursement "if the court determines that the cost of the private education was unreasonable").

## ORDER

For all of the reasons stated above, the Court **ALLOWS** the Does' motion for summary judgment (Dkt. No. 60) but excludes from reimbursement the costs of boarding and travel. The motions for summary judgment filed by BSEA and Newton (Dkt. Nos. 58 at 59) are accordingly **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge